1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Charlotte Brown,                                    ) | CV 04-586-TUC-RCC (JCG) |
|      Plaintiff,                          ) | |
|                     ) | **REPORT AND** |
| vs.                                                 ) | **RECOMMENDATION** |
|                     ) | |
| Tucson Unified School District,                     ) | |
|      Defendant.                         ) | |

Pending before the Court is the defendant's motion for summary judgment filed on August 29, 2005. (Doc. No. 18.) The plaintiff filed a response on September 15, 2005 (Doc. No. 27) and the defendant filed a reply on December 22, 2005. (Doc. No. 44.) The plaintiff in this action, Charlotte Brown ("Brown"), claims retaliation and racial discrimination pursuant to Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000(e-2 et. seq.) and the Arizona Civil Rights Act, A.R.S. § 411401 et. seq., as well as negligent supervision and intentional and/or negligent infliction of emotional distress. The defendant, Tucson Unified School District ("TUSD"), argues that plaintiff's claims must be dismissed because plaintiff cannot prove the elements of her claims.

Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Guerin for a report and recommendation. The Magistrate recommends the District Court, after its independent review of the record, enter an order granting in part and denying in part the defendant's motion for summary judgment.

//

//

## Factual and Procedural Background

Charlotte Brown is an African American Studies Department instructional technician for TUSD. (DSOF 1, PCSOF 1.)[1] She was assigned to Reynolds Elementary School for the 2001-2002 and 2002-2003 school years. (DSOF 2, PCSOF 2.)  Brown did not suffer discrimination or harassment at Reynolds between 2001 and April, 2003. (DSOF 4, PCSOF 4.)

Toward the end of the 2002-2003 school year, Reynolds' teachers received a memorandum asking them to identify African American students for purposes of the following year's classroom assignments ("the Memo"). (DSOF 5, PCSOF 5.)  The parties disagree as to whether the memo also asked teachers to identify all students with behavioral problems, or only African-American students with behavioral problems. (DSOF 5, PCSOF 5, DRPCSOF 5.)  Although Brown was not an intended recipient of the Memo, she requested and received a copy of the Memo because she planned to sit in on meetings regarding class assignments for students with whom she had worked. (PSOF 12, DCSOF 12.)  Brown believed the memorandum to be racially insensitive and attempted to discuss the memorandum with Pete Palazzo, the Reynolds' principal at the time. (DSOF 6, 7, PCSOF 6, 7.)  After attempts to meet with Palazzo failed, Brown took the memorandum to the African-American Studies Department Chair; Brown took no other action with respect to the Memo. (DSOF 8, 9, PCSOF 8, 9.)

On May 5, 2003, Palazzo sent a memorandum to the Reynolds' teachers stating that the Memo's reference to African-American students was a "mistake." (PSOF 26, Exhibit 3; DCSOF 26.)  On or about May 8, 2003, Marla Motove, Chief Academic Officer, sent Palazzo a letter admonishing him for his inadequate response to the Memo, and stating that she believed the Memo to be in violation of TUSD policy prohibiting conduct which

---

[1]     References to the various statements of fact filed in this matter are abbreviated as follows: Defendant's Statement of Facts   (DSOF), Plaintiff's Statement of Facts (PSOF), Defendant's Controverting Statement of Facts (DCSOF), Plaintiff' Controverting Statement of Facts (PCSOF), and Defendant's Response to Plaintiff's Controverting Statement of Facts (DRPCSOF).

1   "denigrates or shows hostility or aversion toward an individual because of his or her race or

2   color." (PSOF 27-29, DCSOF 27-29.) Motove further instructed Palazzo to apologize to the

3   African-American families at Reynolds, to discipline the staff member who sent the Memo,

4   to revise the student classroom assignment process to avoid the implication of racial animus,

5   and to hold a mandatory in-service training on discrimination and harassment at the

6   beginning of the 2003-2004 school year. (PSOF 30, DCSOF 30.) Palazzo sent an apology

7   letter to parents on May 8, 2003. (PSOF 31, DCSOF 31.)

8          A short time later the Memo became public and was discussed at length in the Tucson

9   newspapers. (DSOF 10, PCSOF 10.) It is unclear from the record how publication occurred,

10  but it appears that the first news article regarding the Memo was published one day after

11  Palazzo's apology letter was sent to parents.  Nevertheless, staff members at Reynolds

12  generally regarded Brown as responsible for the negative attention that the school received

13  following the Memo's publication. Shortly after the Memo became public, teachers and staff

14  at Reynolds began to act with hostility toward Brown.  The hostile conduct included the

15  following: one staff member made a comment while with a group of people, including

16  Brown, that they should not use the word "African-American"; five staff members shut doors

17  in Brown's face; one staff member refused to allow Brown to see a student with whom she

18  regularly worked; one teacher blocked Brown's entrance into a classroom by using an

19  intimidating posture; on two occasions, staff members closed their doors when they saw

20  Brown approaching; one teacher started keeping her door locked; one staff member yelled

21  at Brown in front of students; one staff member advised Brown that she should stay in her

22  office and keep a low profile; and one staff member left the room when Brown entered.

23  (PSOF 34-42, DCSOF 34-42.) In addition, Brown claims that she fell on campus, that a staff

24  member was alerted to the situation by a parent, and that the staff member refused to send

25  assistance. (PSOF 44.) The parties disagree as to whether the hostility shown by Reynolds

26  staff to Brown was racially motivated. (DSOF 39, PSOF 39.)  Brown does not allege that

27  any of her supervisors demonstrated hostility toward her. (DSOF 41, PCSOF 41.)

28         Brown actively sought to end the treatment that she was receiving from her co-

1    workers.  She complained to her supervisors about the disrespectful conduct of her peers on
2    numerous occasions.  (PSOF 45, 46, 49, 63, 64, 66, 67, DCSOF 45, 46, 63, 63, 66, 67.)  On
3    September 29, 2003, Brown filed an internal claim with TUSD pursuant to Governing Board
4    Policy 4315.  TUSD describes the claim as a retaliation claim; Brown describes her claim as
5    a retaliation and racial discrimination claim.  (DSOF 19, PCSOF 19.)  Nancy Woll, TUSD's
6    EEOC Compliance Officer, investigated the complaint, interviewing 35 faculty and staff
7    members and reviewing numerous documents.  (DSOF 21, 22, PCSOF 21, 22.)  In a report
8    dated October 24, 2003, Ms. Woll concluded that the Reynolds staff had violated TUSD's
9    policy by its treatment of Brown.  (DSOF 23, PCSOF 23.)

10        On October 20, 2003, Brown filed a complaint with the EEOC.  (DSOF, Exhibit D.)
11   In the section of the form complaint labeled "cause of discrimination," Brown checked the
12   "retaliation" box.  (DSOF, Exhibit D.)  In the EEOC complaint, Brown stated "I objected to
13   a memorandum that I believed to be racially discriminatory.  It is a function of my position
14   to advocate for Respondent's black student population.  Since voicing my concerns regarding
15   the memorandum, I have been subjected to a hostile work environment by my co-workers
16   and administrators.  Although I have complained about my treatment, nothing has been done
17   to prevent the continuing harassment.  I believe, and therefore allege, that but for my
18   complaining of the memorandum, I would not have been treated in this manner."  (DSOF 38,
19   PSOF 38, DSOF Ex. D.)

20        On November 3, 2003, after receiving Ms. Woll's report, Janet Jordan, the new
21   principal at Reynolds, circulated a memorandum to the entire Reynolds staff, reminding them
22   that TUSD policy prohibited retaliation and insisting that Reynolds staff members conduct
23   themselves in a collegial and professional manner.  (DSOF 26-28, PCSOF 26-28.)

24        TUSD also instituted sensitivity training at Reynolds.  (DSOF 16, PCSOF 16.)  The
25   first session occurred on October 1, 2003; an additional session occurred on October 8, 2003.
26   (DSOF 17, 18, PCSOF 17, 18.)

27        Despite Jordan's admonishments to the Reynolds staff, Brown continued to feel that
28   she was being treated unkindly by her co-workers in November and December, 2003.

4

1   (DSOF 29, PCSOF 29.)  On January 27, 2004, Brown requested a transfer to a different

2   school site, agreeing that such a transfer would not be considered retaliation.  (DSOF 30, 31,

3   PCSOF 30, 31.)  Brown was transferred in February, 2004.  (DSOF 32, PCSOF 32.)

4        On October 7, 2004, Brown filed an action in Pima County Superior Court against

5   TUSD asserting claims for:  (1) racial discrimination/hostile work environment in violation

6   of A.R.S. § 41-1401 *et seq.* and Title VII of the Federal Civil Rights Act, 42 U.S.C. §

7   2000(e-2) *et. seq;* (2) retaliatory employment practices in violation of Title VII of the Federal

8   Civil Rights Act, 42 U.S.C. § 2000(e-2) *et. seq;* (3) negligent supervision; and (4) intentional

9   and/or negligent infliction of emotional distress.  On October 26, 2004, TUSD removed the

10  action to the District Court of Arizona on the basis of federal question jurisdiction.  On

11  August 29, 2005, TUSD moved for summary judgment against Brown on all of her claims.[2]

12  On January 10, 2006, a hearing on the motion was held before Magistrate Judge Guerin.

13                       **Summary Judgment Standard**

14       In deciding a motion for summary judgment, the Court views the evidence and all

15  reasonable inferences therefrom in the light most favorable to the party opposing the motion.

16  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d

17  202 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.

18  1987).  Summary judgment is appropriate if the pleadings and supporting documents "show

19  that there is no genuine issue as to any material fact and that the moving party is entitled to

20  a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

21  322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  Material facts are those "that might

22  affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106

23  S.Ct. at 2510.  A genuine issue exists if "the evidence is such that a reasonable jury could

24  return a verdict for the nonmoving party."  *Id.*

25       A party moving for summary judgment initially must demonstrate the absence of a

26

27       [2]   The parties did not brief the state discrimination claims.  At oral argument, the parties
     agreed that the same legal analysis applies to plaintiff's Title VII claims and Arizona Civil Rights
28   Act claims.

                                      5

1    genuine issue of material fact. *Celotex*, 477 U.S. at 325, 106 S. Ct. at 2553-54. The moving

2    party merely needs to point out to the Court the absence of evidence supporting its

3    opponent's claim; it does not need to disprove its opponent's claim. *Id.*; *see also* Fed. R. Civ.

4    P. 56(c). If a moving party has made this showing, the nonmoving party "may not rest upon

5    the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific

6    facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also*

7    *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514; *Brinson v. Linda Rose Joint Venture*, 53 F.3d

8    1044, 1049 (9th Cir. 1995). The nonmoving party may not "replace conclusory allegations

9    of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National*

10   *Wildlife Federation*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).

11                                    **Discussion**

12           In its Motion, TUSD argues that summary judgment in its favor is appropriate because

13   (1) Brown's objection to a memo regarding student placement is not protected activity within

14   the meaning of Title VII, (2) Brown did not suffer an adverse employment action sanctioned

15   by TUSD, (3) Brown has failed to exhaust her administrative remedies with respect to her

16   race discrimination claim, (4) the actions  Brown alleges constitute harassment against her

17   were not motivated by race, (5) Brown has not suffered from "severe and pervasive"

18   harassment within the meaning of Title VII, (6) TUSD took appropriate remedial action to

19   address the alleged harassment, (7) the actions contained in Brown's complaint do not

20   constitute extreme and outrageous conduct sufficient to state a claim against TUSD for

21   intentional infliction of emotional distress, (8) Brown has no legal basis for a claim of

22   negligent infliction of emotional distress, and (9) Brown cannot claim negligent supervision

23   in the absence of an actionable tort claim.

24           The Magistrate recommends finding that TUSD is entitled to summary judgment on

25   plaintiff's claims of racial discrimination, intentional infliction of emotional distress,

26   negligent infliction of emotional distress, and negligent supervision. The Magistrate

27   recommends denying TUSD's motion for summary judgment with respect to the claim of

28   retaliation.

                                          6

### A.    Retaliatory employment practices in violation of Title VII of the Federal Civil Rights Act, 42 U.S.C. § 2000(e-2)

To state a prima facie case of employment retaliation under Title VII, Brown must show that (1) she engaged in a protected activity, (2) TUSD subjected her to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action.  *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing *Steiner v. Showboat Operating Co.*, 25 F.1459, 1464 (9th Cir. 1994)).  TUSD argues that Brown's retaliation claim must fail because she cannot show that she engaged in a protected activity or that TUSD subjected her to an adverse employment action.

### (1)    Protected Activity

Title VII prohibits employers from taking adverse action against employees who oppose an employment practice that is in and of itself a violation of Title VII.  42 U.S.C. §2000e-3(a); *see also Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1995) (citing *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir.1983)).   In other words, an employee's opposition of an employer's violation of Title VII is a "protected activity" within the meaning of Title VII.  It is not necessary that the employment practice actually be unlawful; opposition clause protection will be accorded whenever the opposition is based on a reasonable belief that the employer has engaged in an unlawful employment practice.  *See Moyo,* 40 F.3d at 985.

Brown alleges that she was mistreated after she complained about the school's use of the Memo.  TUSD argues that Brown's opposition of the Memo is not actionable because she was not opposing an unlawful or seemingly unlawful employment action.  TUSD asserts that the Memo did not involve employment practices at all and that, although the Memo can be read as identifying students on the basis of race, even read in that light, Reynolds' students would not have a cause of action under Title VII, because they are not employees of TUSD.  Similarly, TUSD asserts that Brown could not have reasonably believed that in opposing the Memo, she was opposing a violation of Title VII because there is no evidence that Brown objected to the effect of the Memo on *employees*; instead, her opposition was directly aimed

7

at objecting to the harm that she felt the Memo would do to *students*.  In support, TUSD points out that Brown believed that the Memo was "racially biased and in violation of the District's policy"; she "found the [Memo] objectionable because she believed that it targeted a specific minority group," and she believed that "the request to print AA for African American and a red circle for behavior problem violated the law due to the reference to one specific minority group." (PSOF 22, 23, 24, DCSOF 22, 23, 24.)  In her EEOC complaint Brown specifically stated that "I objected to a memorandum that I believed to be racially discriminatory.  It is a function of my position *to advocate for Respondent's Black Student Population*." (DSOF 35, Ex. D.)  In sum, according to TUSD, there is no evidence that Brown believed, whether reasonably or not, that TUSD was discriminating against its employees in the terms and conditions of their employment.  Her focus was on protecting the students and the students do not fall under the umbrella of protection afforded by Title VII.

Under the rule set forth in *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1995), however, Brown's opposition to the Memo can be regarded as an opposition to a practice made unlawful by Title VII.  In *Moyo*, a corrections officer alleged that he was terminated for protesting against and refusing to cooperate with the prison's practice of allowing showers after work shifts to white inmates but not to black inmates working the same job shift.  *Id.* at 984.  The district court granted summary judgment in favor of the employer, and the Ninth Circuit reversed.  The court concluded that Moyo could state a claim for retaliation in one of two ways.  First, because "under the terms of [§ 704(a) of Title VII], requiring an employee to discriminate as a condition of *his* employment is itself an unlawful employment practice, Moyo could state a claim for retaliation  if he could demonstrate at trial that he was discharged for refusing to implement a policy that discriminates against blacks." *Id*. at 985.  Second, the Court concluded that Moyo could prevail if he could show that his belief that an unlawful employment practice occurred was reasonable.  "If Moyo reasonably believed that the inmates were protected by Title VII, then his opposition to their treatment would be a statutorily protected activity."  The court held that the reasonableness of Moyo's belief that an unlawful employment practice occurred must be assessed according to an objective

8

1   standard - one that makes due allowance for the limited knowledge possessed by most Title
2   VII plaintiffs.  The court further indicated that a reasonable mistake may be one of fact or
3   law and emphasized that the reasonableness of a plaintiff's belief that a violation occurred
4   should be broadly construed in light of Title VII's remedial purpose.  *Id.* at 982.

5           Applying the Ninth Circuit's reasoning in the present case, the Magistrate concludes
6   that there is a question of fact as to whether Brown reasonably believed she was engaging
7   in a protected activity.  Like *Moyo*, Brown alleges that she believed that the Memo required
8   district employees to engage in discriminatory treatment by identifying African American
9   students for placement.  Also, like *Moyo*, the impact of the alleged discriminatory treatment
10  was not to the plaintiff or other co-workers, but to those whom the plaintiff supervised.
11  Although Brown does not allege that employees were or could be fired for failing to comply
12  with the Memo's directive, it can be reasonably inferred that  employee insubordination to
13  the Memo's directives could result in discipline.  Viewing the evidence in the light most
14  favorable to plaintiff, this court concludes that there is evidence from which a reasonable
15  juror could conclude that Brown reasonably believed that the Memo mandated her co-
16  workers to unlawfully discriminate in their job performance by identifying African-American
17  students with behavior problems for purposes of classroom assignments.  Accordingly,
18  Brown's opposition to the Memo can be considered an opposition to a Title VII employment
19  violation, and a reasonable juror could conclude that Brown was engaging in protected
20  activity.

21          **(2)    Adverse Employment Action**

22          The Ninth Circuit has adopted the EEOC definition of "adverse employment action,"
23  which recognizes "any adverse treatment that is based on a retaliatory motive and is
24  reasonably likely to deter the charging party or others from engaging in protected activity,"
25  as an adverse employment action.   *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.
26  2000).  Under this rule, lateral transfers, unfavorable job references, and changes in work
27  schedules are all regarded by the Ninth Circuit as reasonably likely to deter employees from
28  engaging in protected activity.  *See id.*

1    Co-worker conduct does not amount to an adverse employment action if it is "mere
2    ostracism," *id.* at 1241, but it does constitute an adverse employment action if it rises to the
3    level of harassment.  *See id.* at 1245.  Co-worker harassment is actionable only if it is
4    "sufficiently severe or pervasive to alter the conditions of the victim's employment and create
5    an abusive working environment."  *Id.* at 1245.  In determining whether co-worker
6    harassment is sufficiently severe, the Ninth Circuit looks at the totality of the circumstances,
7    including the frequency of the discriminatory conduct, its severity, whether it is physically
8    threatening or humiliating, and whether it unreasonably interferes with an employee's work
9    performance.  *See id.*

10    The parties generally agree on the facts regarding the hostility that Brown experienced
11    at work.  After the media buzz surrounding the Memo, staff members at Reynolds "shut
12    doors in [Brown's] face, refused her access to work with students, held covert meetings, made
13    nasty comments in front of students, failed to assist her when she fell on campus, shut doors
14    in her face while she was on crutches, left rooms when she walked in, and demonstrated a
15    general lack of respect."  (PSOF 33, DCSOF 33.)[3]  In addition, one staff member made a
16    comment while with a group of people, including Brown, that they "should not use the word
17    'African American' around here."  (PSOF 34, DCSOF 34.)  On one occasion, Brown felt
18    physically intimidated when a teacher physically blocked her entrance into a classroom by
19    using an intimidating posture; when Brown stated that she was there to pick up two students,
20    the teacher stated "no" and shut the door in Brown's face.  (PSOF 37, DCSOF 37.)

21    Of the factors identified in *Ray v. Henderson*, three weigh in favor of Brown.  Brown's
22    ability to do her job was unreasonably interfered with in that she was denied access to
23    students on several occasions.  *See, e.g., McGinest v. GTE Service Corp.* 360 F.3d 1103,
24    1114-15 (9th Cir. 2004) (considering whether co-worker harassment amounted to an adverse
25    employment action and giving weight to the fact that co-workers refused to work under

27    _____
      [3]    Although TUSD claims that the record does not support this claim (DCSOF 44), it is in
28    fact supported by Brown's deposition testimony and not contradicted by other evidence.  (PSOF 44,
      Exh. 1, pg. 84-85.)

1   plaintiff's direction, thereby affecting his ability to do his job).   Brown felt physically

2   intimidated, albeit only  on one occasion.   The hostility that Brown experienced occurred

3   frequently – on approximately fifteen occasions over a period of eight months - from May,

4   2003, to December, 2003.  The incidents consisted of doors being shut in Brown's face and

5   teachers prohibiting Brown from entering classrooms.   While the conduct by Brown's co-

6   workers was not so frequent or severe as some other cases, considered in its totality, it is

7   sufficient to rise to the level that a reasonable juror could conclude that there was an abusive

8   working environment which adversely effected Brown's employment.  *See, e.g., McGinest,*

9   360 F.3d at 1115 (finding triable issue of fact regarding co-worker harassment where plaintiff

10  was involved in a serious automobile accident because, due to his race, both his supervisor

11  and garage personnel were unwilling to ensure that his vehicle received necessary

12  maintenance, and where plaintiff was forced to work in dangerous situations and barraged

13  with insults and abuse); *Ray,* 217 F.3d at 1245  (finding a triable issue of fact regarding co-

14  worker harassment where plaintiff was targeted for verbal abuse related to those complaints

15  for a period lasting over one and half years, called a "liar," a "troublemaker," and a "rabble

16  rouser," and told to "shut up," subjected to a number of pranks, falsely accused of misconduct

17  and made an object lesson about the perils of complaining about sexual harassment in the

18  workplace); *Knox v. State of Ind.*, 93 F.3d 1327, 1335 (7th Cir. 1996) (concluding that a jury

19  finding of adverse employment action was supported by the facts where co-workers called

20  the plaintiff a "fucking bitch" and said that they would "get her" and make her life hell after

21  the plaintiff complained of sexual harassment).

22      TUSD argues that Brown cannot show an adverse action because she cannot

23  demonstrate that her supervisors orchestrated the harassment or acquiesced in the conduct

24  in such a way as to demonstrate that the co-worker harassment was condoned or encouraged.

25  An employer can only be liable for co-workers' retaliatory harassment where its supervisory

26  or management personnel either (1) orchestrate the harassment or (2) know about the

27  harassment and acquiesce in it in such a manner as to condone and encourage the co-workers'

28

1   actions. *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998).[4]  Four

2   TUSD employees were arguably "supervisors" of Brown during the relevant time period:

3   Palazzo (PSOF 17, DCSOF 17), Langford (PSOF 19, DCSOF 19), Jordan (PSOF 47, DCSOF

4   47) and Hines (PSOF 67, DCSOF 67).  Plaintiff has not alleged that those four individuals

5   were in any way involved in the alleged harassment.  However, a reasonable juror could

6   conclude that supervisors' significant delays in responding to Brown's claims of harassment

7   amounted to acquiescence.  Brown submits evidence that she was harassed from early May

8   2003 through January 2004.  She alleges that she complained to Langford about the

9   retaliation the second week of May 2003 (SOF 45), to Palazzo at the end of the 2002-2003

10  school year and to Jordan before the 2003-2004 school year began.  Although Jordan assured

11  Brown that she would support her (PSOF 49, DCSOF 49) and actively pursued sensitivity

12  training for Reynolds' staff (PSOF 52, 57, 59, DCSOF 52, 57, 59), this did not occur until

13  months after Brown's complaints of retaliation.  TUSD notes that upon receiving Ms. Woll's

14  report of October 23, 2003, Jordan promptly sent a memorandum to the Reynolds' staff,

15  reminding them that TUSD policy prohibited retaliation and insisting that Reynolds' staff

16  members conduct themselves in a collegial and professional manner (DSOF 26-28, PCSOF

17  26-28); however, at that point Brown had been complaining of retaliatory treatment for over

18  five months.  Moreover, Brown alleges that the retaliatory treatment did not cease despite her

19  continuing to report the treatment to Jordan and Hines.  (SOF 86.)

20      In sum, the Magistrate Judge concludes there is a material issue of fact as to whether

21  Brown reasonably believed she was engaging in a protected activity, whether the treatment

22  that Brown received amounted to an adverse action and whether her supervisors acquiesced

23  to her co-workers' treatment of her; therefore, the Magistrate recommends denying summary

24

25

26  [4]  Although *Gunnell* is a Tenth Circuit case, it has been cited with approval by this Circuit, s*ee Ray*, 217 F.3d at 1244-45; *Fielder v. UAL Corp.*, 218 F.3d 973 (9th Cir. 2000), *judgment vacated on other grounds by UAL Corp. v. Fielder,* 536 U.S. 919 (2002), and the parties agreed at oral

27  argument that it should be applied in this case.  In addition, *Gunnell's* holding is in keeping with Title VII's requirement that the plaintiff must show that she was subjected to an adverse employment

28  action by the employer.  Thus, it is reasonable for the Court to apply *Gunnell* in this case.

1    judgment on Brown's retaliation claim.

2        **B.    Racial Discrimination**

3            In order to prevail on a Title VII racial discrimination/hostile workplace claim, Brown

4    must demonstrate that she has exhausted her administrative remedies such that this Court has

5    subject matter jurisdiction over her claim. *See Vasquez v. City of Los Angeles*, 349 F.3d 634,

6    644 (9th Cir. 2001). Once she establishes jurisdiction, Brown's racial discrimination/hostile

7    workplace claim depends upon her ability to establish the substantive elements of the claim,

8    specifically that: (1) she was subjected to verbal or physical conduct of a racial nature, (2)

9    the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter

10   the conditions of her employment and create an abusive work environment. *See Vasquez*,

11   349 F.3d 634 at 642. Finally, because Brown has alleged harassment at the hands of co-

12   workers, she must prove that TUSD knew or should have known of the conduct and failed

13   to take adequate remedial measures. *See Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th

14   Cir. 1995); *see also Woodland v. Ryerson & Son*, 302 F.3d 839, 843 (8th Cir. 2002).

15           The Magistrate recommends finding that Brown failed to exhaust her administrative

16   remedies, and that her claim for racial discrimination is therefore barred. In the alternative,

17   the Magistrate recommends finding that Brown has not created a material issue of fact as to

18   whether she was subjected to verbal or physical conduct of a racial nature, and has therefore

19   failed to state a claim for racial discrimination.

20       **(1)    Failure to Exhaust Administrative Remedies**

21           This court has subject matter jurisdiction over all claims of discrimination that fall

22   within the scope of the EEOC's actual investigation or an EEOC investigation that could

23   reasonably be expected to grow out of the charge. *See Vasquez*, 349 F.3d at 644. The

24   administrative charge requirement "serves the important purposes of giving the charged party

25   notice of the claim and narrowing the issues for prompt adjudication and decision." *B.K.B.*

26   *v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002) (internal citations omitted). For

27   these reasons, Title VII requires that the charge be sworn, and that the EEOC send notice of

28   the charge to the named respondent. *See id.* (internal citations omitted).

13

1  The EEOC did not investigate a racial discrimination claim by Brown. (Attorney

2  General Reply in Support of Motion to Quash (stating that Brown's EEOC complaint alleged

3  only a charge of retaliation)).[5]  Moreover, Brown's race discrimination claim could not

4  reasonably be expected to grow out of the charge that Brown did file.  There is nothing in

5  Brown's EEOC complaint which could be fairly construed as giving TUSD notice that Brown

6  intended to allege a claim for race discrimination.  As TUSD points out in its Motion, in the

7  section of the complaint form labeled "cause of discrimination," Brown checked only the

8  "retaliation" box, not the "race" box.  *See Vasquez*, 349 F.3d at 645; *BKB*, 276 F.3d at 1100

9  (referring to the boxes checked on an EEOC complaint when evaluating the nature of the

10  complaint).  Although Brown claims that it is "unclear" whether the responsibility for

11  checking the "race" box fell to her or to EEOC intake, Brown had the opportunity to review

12  the complaint and signed it, avowing its truth and accuracy.  *See* AG's Reply in Support of

13  Motion to Quash (stating that pursuant to Arizona law, the EEOC drafts the charge for the

14  plaintiff but the plaintiff reviews it and signs it).

15  In determining whether a plaintiff has exhausted allegations that she did not specify

16  in her administrative charge, it is appropriate to consider such factors as the alleged basis of

17  the discrimination, dates of discriminatory acts specified within the charge, perpetrators of

18  discrimination named in the charge, and any locations at which discrimination is alleged to

19  have occurred.  In addition, the court should consider plaintiff's civil claims to be reasonably

20  related to allegations in the charge to the extent that those claims are consistent with the

21  plaintiff's original theory of the case.  *See BKB*, 276 F.3d at 1100.  In the present case, in

22  addition to the fact that Brown checked only the "retaliation" box on her EEOC complaint,

23  the factual allegations of the EEO complaint do not include any mention of race

24  discrimination against Brown; the only mention of race in the EEOC Complaint is with

25

26  [5]  The Attorney General's Office previously moved to quash the deposition of Judy
Drickey-Prohow, whom both parties intended to call as a witness on the issue of the AG's
27  investigation into Brown's EEOC complaint. The AG's motion was granted. Both parties agree that
entire record in this case may be considered by the Court in deciding the motion for summary
28  judgment, *see* TUSD Motion, pg. 2; Brown Response pg. 1.

respect to Brown's allegation that the Memo was racially discriminatory against the *students*. Brown further stated that she had been mistreated because she objected to the memo; she did not mention mistreatment due to her own race.  The EEOC Complaint states:

> I objected to a memorandum that I believed to be racially discriminatory.  It is a function of my position to advocate for Respondent's black student population.  Since voicing my concerns regarding the memorandum, I have been subjected to a hostile work environment by my co-workers and administrators.  Although I have complained about my treatment, nothing has been done to prevent the continuing harassment.  I believe, and therefore allege, that *but for my complaining of the memorandum*, I would not have been treated in this manner.  (Emphasis added).

(DSOF 19, Ex. D.) Because Brown specifically identifies her opposition to the Memo as the cause for her hostile treatment at work and fails to allege racial discrimination or identify instances of racial discrimination, the Magistrate recommends finding that  subject matter jurisdiction is lacking over Brown's claim of racial discrimination.

### (2)     The conduct toward Brown was not motivated by race.

The Magistrate further recommends granting summary judgment to TUSD on the race discrimination claim because Brown has failed to demonstrate a material issue of fact as to whether the conduct toward her was racially motivated.  Just as allegations of racial discrimination are absent from Brown's EEOC complaint, the record as a whole lacks facts to support Brown's claim that TUSD discriminated against her on the basis of her race.  In response to TUSD's argument that Brown has attributed her discourteous treatment completely to her disclosure of the Memo, not to her race, Brown contends that the record is replete with "a litany of behaviors to which Plaintiff was subjected reasonably attributable to racial animus."  Of that "litany," however, Brown specifically identifies only a single example:  "one staff member made a comment while with a group of people including Plaintiff, that the word 'African-American' should not be used around here."  Brown Opposition, pg. 19.  This single reference, without more, does not rise to the level of racial discrimination.  Brown testified in her deposition that she did not consider the term "African-American" to be a racial epithet.  (*See* DSOF 39, Ex. A, pg. 71.)  Even if it were, the "mere

utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not, by itself, actionable under Title VII." *Anthony v. County of Sacramento*, 898 F.Supp. 1435, 1447 (E.D.Cal. 1995) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986)). Because Brown's claim is insufficient as a matter of law, the Magistrate recommends granting summary judgment in favor of TUSD on Brown's racial discrimination claim.

### C.   Intentional Infliction of Emotional Distress

In order to state a claim for intentional infliction of emotional distress under Arizona law, Brown must demonstrate that (1) TUSD engaged in extreme and outrageous conduct, (2) TUSD either intended to cause Brown emotional distress or recklessly disregarded the near certainty that such distress would result from its conduct, and (3) that severe emotional distress did indeed occur as a result of TUSD's conduct. *See Ford v. Revlon*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). The trial court must determine whether the acts complained of are sufficiently extreme and outrageous to state a claim for relief. *See Mintz v. Bell Atlantic Systems Leasing*, 183 Ariz. 550, 554, 905 P.2d 559, 563 (App. 1995) (citing *Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 118 Ariz. 473, 476, 578 P.2d 152, 155 (1978)). Only when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous does the issue go to the jury. *See id.* (citing *Lucchesi v. Stimmell*, 149 Ariz. 76, 79, 716 P.2d 1013, 1016 (1986)).

The "extreme and outrageous conduct" element of an intentional infliction of emotional distress claim requires the plaintiff to show that the defendant's acts were "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exchange*, 10 Ariz.App. 560, 562, 460 P.2d 666, 668 (1969) (quoting Restatement (Second) of Torts § 46 cmt. d), *overruled on other grounds, Godbehere v. Phoenix Newspapers, Inc.,* 162 Ariz. 335, 783 P.2d 781, 784 (1989). Because the terms "outrageous conduct" and "severe emotional distress" evade precise legal definition, the court analyzes such claims on a case-by-case basis. *See Coffin v. Safeway*, 323 F.Supp.2d 997, 1003 (D. Ariz. 2004).

1    Even when the facts of this case are construed in the light most favorable to Brown,

2    Brown has not satisfied the "extreme outrageous conduct" element of her claim. Accepting

3    Brown's allegations as true, her co-workers' conduct can be characterized as rude and

4    unprofessional. Her co-workers shut doors in her face, made inappropriate comments when

5    she walked into a room, refused her access to work with students, held covert meetings, made

6    nasty comments in front of students, failed to assist her when she fell on campus, shut doors

7    in her face while she was on crutches, left rooms when she walked in, and demonstrated a

8    general lack of respect. (PSOF 33, DCSOF 33.) It is undisputed that Brown received

9    medical treatment for the immense stress she felt as a result of her work environment. (PSOF

10   89, DCSOF 89.) Brown contends that the stress caused her to be taken by ambulance from

11   Reynolds, and TUSD does not dispute that contention.[6] (PSOF 88, DCSOF 88.)

12   In support of her claim, Brown relies on *Coffin v. Safeway*, 323 F.Supp.2d 997, 999

13   (D. Ariz. 2004), in which a plaintiff alleged a claim for intentional infliction of emotional

14   distress arising from her employer's sexual harassment at work: the plaintiff's supervisor

15   "used his position as a managerial supervisor at Safeway to sexually harass and discriminate

16   against her . . . sought sexual favors . . . [and] made numerous verbal remarks, sounds,

17   gestures to Plaintiff such as (1) 'you smell so good I could almost taste you' (2) 'I bet you

18   taste good' (3) 'I wish you would gain more weight because I like more meat on your butt.'

19   Also, . . . [the supervisor] "would frequently walk up behind her and while in close proximity

20   would tell [her] that he wanted to rub up against her body, and [the employer] did not take

21   any corrective measures to stop [the supervisor]." (internal citations omitted).

22   *Coffin* is distinguishable for several reasons. First, *Coffin* concerned a motion to

23   dismiss, not a motion for summary judgment, and therefore the district court applied a lower

24

25

26   [6]    Because of the way that Brown words the allegation – "In her request for a transfer away from Reynolds, Plaintiff references the fact that she was taken by ambulance from Reynolds on November 15, 2003 as a result of the impact of the retaliation and hostile work environment on her health" – it is unclear whether TUSD's admission is intended as an admission that the hostile work environment caused Brown to need an ambulance, or whether TUSD is admitting only that Brown believed that to be the cause.

27

28

1    standard of scrutiny.  *See Coffin*, 323 F.Supp.2d at 1006-07 (challenge to sufficiency of

2    pleadings rejected; Rule 8, Fed.R.Civ.P, requires only a short and plain statement of the

3    claim showing pleader is entitled to relief; specific facts to meet the "high" standard of

4    conduct to support an intentional infliction of emotional distress claim are not necessary at

5    the pleading stage).  Second, the court in *Coffin* gave special weight to the fact that the sexual

6    harassment alleged by the plaintiff occurred at the hands of a supervisor with apparent or

7    actual authority over the plaintiff, a factor which is not present in Brown's case.  *See id.* at

8    1003.  Third and finally, the type of conduct alleged in *Coffin* is not factually similar to

9    Brown's case:  *Coffin* involves verbal and physical sexual harassment that was both blatant

10   and offensive; Brown's claim involves retaliatory treatment consisting largely of hostile

11   shunning by co-workers.

12          TUSD argues that Brown's allegations are more analogous to the facts at issue in

13   *Wallace v. Casa Grande Union High School District,* 184 Ariz. 419, 428, 909 P.2d 486, 495

14   (App. 1995), in which the court granted a motion to dismiss a plaintiff's intentional infliction

15   of emotional distress claim against her employer, who had recommended that the plaintiff

16   employee's contract not be renewed, lawfully changed her duties, lawfully reduced her salary

17   and told her that "nobody likes [her]" and that "[she] piss[ed] people off."  While *Wallace*

18   is certainly more similar to the present case than *Coffin*, it presents facts that are clearly less

19   egregious than the facts of the present case.

20          Other decisions of this Court and the Arizona courts, however, demonstrate that

21   TUSD is entitled to summary judgment on Brown's claim for intentional infliction of

22   emotional distress.  This Court has held that it is "extremely rare to find conduct in the

23   employment context that will rise to the level of outrageousness necessary to provide a basis

24   for recovery for the tort of intentional infliction of emotional distress." *Spratt v. Northern*

25   *Automotive Corp.,* 958 F.Supp. 456, 461 (D.Ariz. 1996) (citing *Cox v. Keystone Carbon Co.*,

26   861 F.2d 390, 395 (3d Cir.1988)).  In other employment cases, conduct on the part of the

27   employer which appears far more outrageous than the conduct of the TUSD employees in

28   this case has not satisfied the "extreme and outrageous" conduct element of an intentional

infliction of emotional distress claim at the summary judgment stage. *See, e.g. Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (App. 1994) (holding that plaintiff could not prevail on a claim for intentional infliction of emotional distress where he was called to work at 3:00 a.m., marched by armed guards out of his office and into the lobby, and then fired in front of the news media); *Mintz v. Bell Atlantic Systems Leasing Intern., Inc.,* 183 Ariz. 550, 905 P.2d 559 (App.1995) (granting motion to dismiss intentional infliction of emotional distress claim where plaintiff's complaint alleged that employer discriminated against her on the basis of sex in failing to promote her, that plaintiff was hospitalized for severe psychological and emotional problems as a result of not being promoted, that plaintiff's employer forced her to return to work against a physician's recommendation, and that plaintiff's employer hand delivered a termination letter to her while she was in the hospital); *Stingley v. State of Ariz.,* 796 F.Supp. 424, 431 (D.Ariz.1992) (denying summary judgment on intentional infliction of emotional distress claim where plaintiff employee was poked in the buttocks with a fork by her co-worker, who was "checking to see if the meat was done," but also noting that other conduct by co-workers and supervisors, including the use of racial epithets, giving the plaintiff a nickname related to her breast size, calling plaintiff a "black bitch slut," and snapping plaintiff's bra did not amount to outrageous conduct). Thus, the Magistrate recommends finding that Brown is not entitled to take her intentional infliction of emotional distress claim to the jury, and that the Court grant summary judgment in favor of TUSD on this claim.

### D.   Negligent Infliction of Emotional Distress

In order to prevail on her claim for negligent infliction of emotional distress, Brown must demonstrate that TUSD acted negligently such that it created a "zone of danger," *i.e.* an unreasonable risk of bodily harm to Brown, and that as a result of being in the zone of danger Brown suffered shock or mental anguish manifested by physical injury. *See Quinn v. Turner*, 155 Ariz. 225, 227, 745 P.2d 972, 974 (App. 1987).

As a threshold matter, the Magistrate notes that the "zone of danger/bodily harm" element of negligent infliction of emotional distress claims makes it ill-suited for

employment discrimination cases.  Although its conceivable that a zone of danger could exist in the workplace, such as if an employer negligently disregarded retaliation or sex/race-based harassment by co-workers to the point that the plaintiff employee was at risk of being physically harmed by co-workers, such a fact pattern seems unlikely.  At any rate, the record is devoid of evidence suggesting that Brown was ever placed in a zone of danger by TUSD: to the contrary,  Brown admitted in her deposition that she was never threatened with bodily harm.  *See* TUSD Reply, pg. 11, DSOF 39, Ex. A, pg. 72.  Thus, summary judgment on this claim is appropriate.

   **E.    TUSD is entitled to summary judgment on Brown's claim for negligent supervision**

   In order to state a claim for negligent supervision, Brown must demonstrate that she was injured as a result of a TUSD employee committing a tort.  *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 398, 799 P.2d 15, 18 (App. 1990).  In its motion for summary judgment, TUSD argued that Brown has alleged only two torts – intentional and negligent infliction of emotional distress – and that both of those torts are alleged against employer TUSD, not its employees.  Accordingly, TUSD argues, Brown cannot prevail on her claim for negligent supervision.  Brown did not respond to TUSD's argument in her Opposition.  The Magistrate agrees with TUSD's analysis, and recommends finding that Brown cannot state a claim for negligent supervision and that her failure to respond to TUSD's motion for summary judgment on this ground constituted an abandonment of her claim.

### Recommendation

   Based on the foregoing, the Magistrate Judge recommends the District Court, after its independent review of the record, enter an order:  GRANTING in part and DENYING in part the defendant's motion for summary judgment (Doc. No. 18), dismissing Brown's claims of racial discrimination, intentional infliction of emotional distress,  negligent infliction of emotional distress, and negligent supervision, and permitting Brown to present her claim of retaliation to the finder of fact.

   Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within

20

10 days of being served with a copy of this Report and Recommendation.  If objections are not timely filed, they may be deemed waived.  If objections are filed, the parties should use the following case number:  **CV 04-586-TUC-RCC**.

**DATED** this 4th day of October, 2006.

_____
Jennifer C. Guerin
United States Magistrate Judge